IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA


v.                                    CRIMINAL NO.   2:19-00037


D'ALFONZA V. MIKELL


### MEMORANDUM OPINION AND ORDER

Defendant D'Alfonza V. Mikell is charged in a three-count indictment with possession with intent to distribute methamphetamine and heroin, in violation of 21 U.S.C. § 841(a)(1), (Count One); carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), (Count Two); and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), (Count Three).

Pending before the court is defendant's motion to suppress evidence. (ECF No. 31). Specifically, defendant moves to "suppress all evidence that was seized incident to [his] arrest" because his arrest "without a warrant was not supported by probable cause." Id. at p. 7. On May 6, 2019, the court conducted an evidentiary hearing on defendant's motion. Present at that hearing were Louie Alexander Hamner, Assistant United States Attorney, on behalf of the United States; and defendant, who appeared in person and by his counsel, Roger L. Lambert.

Detectives Seth Johnson and Matthew Petty testified at the hearing.

For reasons expressed more fully below, the motion to suppress is **DENIED**.  In support of its ruling, the court makes the following findings of fact and conclusions of law.

## I.  Findings of Fact

On the evening of January 8, 2019, Detective Eric Seth Johnson with the Charleston Police Department ("CPD") and assigned to the Metro Drug Unit Network Team ("MDENT")[1] received information from a confidential source[2] ("CS1") that two individuals from Ohio were selling drugs in the Charleston area. CS1 described the two individuals as a smaller black male who went by the name Diablo and a larger black male going by the name of "B".  CS1 advised Detective Johnson that he or she had seen both Diablo and B with large quantities of methamphetamine and heroin in Charleston and that he believed B was the "enforcer" and often carried a firearm.[3]  CS1 also informed Detective

---

[1]  Detective Johnson had worked in law enforcement for approximately six and a half years and for the CPD for three and a half years.

[2]  Detective Johnson explained that a confidential source is someone who approaches law enforcement to provide information.  A confidential informant, on the other hand, enters into a contract of sorts with law enforcement and participates in controlled buys and/or similar activities.

[3]  Detective Johnson testified that, in his training and experience, an enforcer is an inherently dangerous person.

Johnson that he or she would let him know when Diablo and B were to return to the area.

The next evening, January 9, 2019, Detective Johnson received information from another confidential source ("CS2") regarding drug dealers from Ohio. Upon being arrested, CS2 had asked to speak with MDENT in order to provide information in an attempt to help his or her significant other. CS2 informed Detective Johnson of two black males, going by the names of Diablo and B, from Columbus, Ohio who were providing drugs to his or her significant other. CS2 told Detective Johnson that his or her significant other, who was battling addiction, obtained drugs from Diablo and B to sell in the Charleston area. According to CS2, B was the larger of the two men and he often carried a firearm. CS2 advised that he or she had been in the house with Diablo and B when they were supplying his or her significant other with drugs although CS2 was often told to leave the room. CS2 stated that he or she had observed Diablo and B with large quantities of methamphetamine.

Detective Johnson testified that he did not inform CS1 and CS2 about each other and that, to his knowledge, they were not aware that the other had spoken to him or that they even knew each other.

On the morning of January 10, 2019, at approximately 10:45 a.m., CS1 contacted Detective Johnson to inform him of an

upcoming drug transaction between someone CS1 knew and Diablo and B.  According to CS1, the transaction was to occur at the McDonald's located in the east end of Charleston.  Detective Johnson then received another call from CS1 at approximately 11:51 a.m., informing him that the drug deal was to happen in the next 15 minutes.  Detective Johnson advised other law enforcement officers, including Detective Matthew Petty,[4] of the information he received from CS1.

Detective Johnson proceeded to the McDonald's and Detective Petty did the same.  Detective Petty was in an unmarked MDENT van with approximately five or six other MDENT officers and the van was parked in a location where Detective Petty and the other officers could conduct visual surveillance of the McDonald's parking lot.  Detective Johnson, who was in a police cruiser, waited in a location not in direct view of the McDonald's.

Within five minutes of receiving the second call from CS1, a white rental truck with an Ohio license plate pulled into the McDonald's parking lot.  Detective Petty observed two black males in the front of the truck matching the description provided by CS1 and CS2.  After parking, the occupants in the truck did not get out.  According to Detectives Johnson and Petty, in their experience as law enforcement officers, this is consistent with

_____

[4]  Detective Petty had been an employee of the Charleston Police Department for fourteen years and assigned to the MDENT for ten years.

4

drug dealing activity.  Detective Petty testified that drug
dealers often choose to meet in public places so that they can
blend in.  Detective Johnson also noted that these deals
frequently are carried out in cars because the persons involved
feel it is safer.  The fact the suspects did not exit the vehicle
was further indicative of drug dealing activity according to
Detective Petty because it suggests they were not there for a
lawful purpose.  Detective Petty then saw CS1, whom he
recognized, walk up to the truck on the passenger side and reach
inside the window.  CS1 then walked away as the truck remained
parked with the two black males inside.

Concluding that a drug transaction had just occurred,
Detective Petty made the decision to approach the truck and,
according to Detective Johnson, advised the other officers to
"pull in" or "move in" or words to that effect.  Detective Petty
and the other five or six officers in the MDENT van approached
the truck with their weapons drawn and wearing their police
vests.  Announcing themselves as law enforcement, the occupants
of the truck were advised to "show their hands" or "put their
hands up" or words to that effect.[5]  Detective Johnson arrived at

_____
[5]  Detective Johnson testified that law enforcement tells
suspects to show their hands for their protection.  Detective
Johnson was concerned about officer safety given that drug
dealing can often lead to violence and, in this case, he had
received information from CS1 and CS2 that the suspects were
dangerous.  Detective Petty testified that the officers had their
guns drawn as a precaution because they had information that B
was an enforcer and possibly armed.

the scene as Detective Petty and the other officers were approaching the white truck.

Detective Petty approached the driver's side of the truck and removed the driver. Defendant was sitting in the front seat on the passenger side of the truck.[6] As defendant was being removed from the truck and secured by Detective Aldridge, Detective Petty noticed a firearm on the passenger's seat under defendant's leg and alerted the other officers of the existence of the firearm. Detective Dennison secured the firearm.

Two women were in the back of the truck. All four occupants of the truck were placed in handcuffs for officer safety. Detective Aldridge searched defendant and discovered a bag of suspected methamphetamine, a bag of suspected heroin, and a large sum of United States currency. At this point, defendant was placed under arrest.

Incident to defendant's arrest, officers searched the vehicle. Large quantities of suspected methamphetamine and heroin were recovered from the truck's center console as well as a scale of the type often used in narcotics trafficking. All narcotics recovered were field tested and the results of those tests were positive. The officers later learned that no drug transaction had occurred between CS1 and defendant.

---

[6] Detectives Johnson and Petty identified defendant as the occupant of the passenger's seat in the front of the truck.

The court found the testimony of both witnesses testifying at the hearing to be entirely credible.  Furthermore, their testimony was consistent with Detective Johnson's Case Report prepared on January 10, 2019.  See ECF No. 33-1.

## II.  Conclusions of Law and Analysis

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The defendant bears the burden of demonstrating a Fourth Amendment violation, Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978), and, on appeal, the court reviews the evidence in the light most favorable to the party prevailing below.  See United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).  The factual findings underlying a motion to suppress, including credibility determinations, are reviewed for clear error, while the legal determinations are reviewed de novo.  See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995); United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, 506 U.S. 926 (1992).

Not every encounter between a private citizen and law enforcement implicates the Fourth Amendment.  See United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) ("[The Fourth Amendment], however, does not extend to all police-citizen

encounters."); see also United States v. McCoy, 513 F.3d 405, 411
(4th Cir. 2008) ("Of course, the protections of the Fourth
Amendment do not bear on every encounter between a police officer
and a member of the public; it is only when a `search' or
`seizure' has occurred that the Fourth Amendment comes into
play.").

> The Supreme Court has recognized three distinct types
> of police-citizen interactions: (1) arrest, which must
> be supported by probable cause; (2) brief investigatory
> stops, which must be supported by reasonable suspicion;
> and (3) brief encounters between police and citizens,
> which require no objective justification.

United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002)
(internal citations omitted).

The probable cause standard governing arrests is "an
objective one; it exists when, `at the time the arrest occurs,
the facts and circumstances within the officer's knowledge would
warrant the belief of a prudent person that the arrestee had
committed or was committing an offense.'" United States v.
Johnson, 599 F.3d 339, 346 (4th Cir. 2010) (quoting United States
v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984)); see also Smith v.
Munday, 848 F.3d 248, 253 (4th Cir. 2017) ("Probable cause is
determined by a totality-of-the circumstances approach. . . . It
is an objective standard of probability that reasonable and
prudent persons apply in everyday life.") (internal citations and
quotations omitted). "The probable-cause inquiry turns on two
factors: `the suspect's conduct as known to the officer, and the

contours of the offense thought to be committed by that

conduct.'" Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017)

(quoting Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016)).

As the court explained:

> [T]he probable-cause inquiry "examine[s] the facts
> within the knowledge of the arresting officers to
> determine whether they provide a probability on which
> reasonable and prudent persons would act; we do not
> examine the subjective beliefs of the arresting
> officers to determine whether they thought that the
> facts constituted probable cause.

Id. at 253 (quoting Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir.

2016)). "[A] mere hunch that illegal activity is afoot . . . [is

not] probable cause.'" Gagnon, 831 F.3d at 186 (citations

omitted).

As for investigatory stops, the second category of police-

citizen encounters noted above, in Terry v. Ohio, 392 U.S. 1, 30

(1968), the Supreme Court held that "an officer may, consistent

with the Fourth Amendment, conduct a brief, investigatory stop

when the officer has a reasonable, articulable suspicion that

criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119,

123 (2000).[7] According to the Court,

> While "reasonable suspicion" is a less demanding
> standard than probable cause and requires a showing
> considerably less than preponderance of the evidence,
> the Fourth Amendment requires at least a minimal level
> of objective justification for making the stop. The
> officer must be able to articulate more than an

---

[7] These types of investigative stops are often referred to
as Terry stops. See United States v. Beckham, 325 F. Supp.2d
678, 683 (E.D. Va. 2004).

"inchoate and unparticularized suspicion or `hunch'" of
criminal activity.

Id. at 123-24 (internal citations omitted).  In determining
whether reasonable suspicion exists, a court must consider the
totality of the circumstances.  United States v. Smith, 396 F.3d
579, 583 (4th Cir. 2005).

As for the last category of police-citizen encounters, "[a]s
a general matter, law enforcement officers do not seize
individuals `merely by approaching [them] on the street or in
other public places and putting questions to them.'"  United
States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) (quoting
United States v. Drayton, 536 U.S. 194, 200 (2002)).  A person is
"seized" within the meaning of the Fourth Amendment "only when,
by means of physical force or a show of authority, his freedom of
movement is restrained."  United States v. Mendenhall, 446 U.S.
544, 553 (1980).

Ordinarily, the initial step of any Fourth Amendment seizure
analysis is "to determine whether a seizure took place and, if
so, when the seizure occurred."  United States v. Brown, 765 F.3d
278, 288 (3d Cir. 2014); see also United States v. Smith,
Criminal No. 07-00119, 2008 WL 2329103, *3 (W.D. Pa. June 4,
2008) ("[B]efore proceeding to the Terry analysis, the Court must
first determine when the officers seized Defendant Smith hence
triggering the protections of the Fourth Amendment because the
same is not implicated until a seizure occurs.").

Defendant maintains that he was arrested within the meaning of the Fourth Amendment as soon as law enforcement approached the truck and ordered the occupants to put their hands up. The government contends that the initial approach to the truck up to law enforcement placing defendant under arrest was a brief investigatory stop that need only be supported by reasonable suspicion.

Against this backdrop, the court has examined the events of January 10, 2019.

A.  *Law Enforcement Surveillance of the McDonald's Parking Lot.*

The Fourth Amendment was not implicated by law enforcement's surveillance of the McDonald's parking lot. "[A] law enforcement officer's observations from a public vantage point where he has a right to be and from which the activities or objects he observes are clearly visible do not constitute a search within the meaning of the Fourth Amendment." United States v. Taylor, 90 F.3d 903, 908 (4th Cir. 1996).

B.  *Law Enforcement Approach the Truck and Apprehend Defendant*

There is little doubt, and the parties agree, that once law enforcement personnel surrounded the truck with their weapons drawn and ordered defendant and the other occupants to exit the vehicle a seizure had occurred. A person is "seized" within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is

restrained." <u>Mendenhall</u>, 446 U.S. at 553. It is the nature of that seizure over which the parties disagree. According to defendant, from the moment that Detective Petty gave the order to "move in" and "take down" defendant and the other occupant, he was under arrest.[8] The court does not agree.

At the time law enforcement approached the white truck and apprehended defendant such that defendant was actually seized, the totality of the circumstances gave rise to reasonable suspicion justifying a <u>Terry</u> stop of defendant. During "brief investigatory stops of persons or vehicles that fall short of [a] traditional arrest," such as <u>Terry</u> stops, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)).

---

[8] Significantly, even if Detective Petty <u>thought</u> he was arresting defendant when he gave the command to move in – and the evidence of record is that he did not – that does not necessarily lead to the conclusion that an arrest has occurred. "[T]he subjective views of a police officer who effects a detention have no bearing on whether that detention constitutes an arrest. Rather, an arrest is defined using an objective standard: whether the suspect's freedom of action is curtailed to a degree associated with formal arrest." <u>United States v. Elston</u>, 479 F.3d 314, 319 (4th Cir. 2007) (internal citations and quotations omitted). Likewise "immaterial" is whether a "reasonable person would have felt free to leave in the circumstances of [defendant's] initial detention." <u>Id.</u> "[T]he perception that one is not free to leave is insufficient to convert a <u>Terry</u> stop into an arrest. A brief but complete restriction of liberty is valid under <u>Terry</u>." <u>Id.</u> (internal citation and quotation omitted).

The court has no trouble concluding that law enforcement's initial approach to the vehicle and seizure of defendant up to and including his removal from the vehicle did not run afoul of the Fourth Amendment. The MDENT officers had a reasonable suspicion based on articulable facts that criminal activity was afoot. In this case, law enforcement was provided information from two separate confidential sources that two black males from Ohio, going by the names of Diablo and B, were engaged in narcotics trafficking in the Charleston area. Both sources stated that Diablo and B dealt in large quantities of methamphetamine and/or heroin and that B often carried a gun and was the enforcer. These two sources, completely independent from one another and without knowledge of the other, provided nearly identical information within twenty-four hours of each other. This information, because it was provided by two independent sources, was corroborated.

That information was further corroborated by the information provided by CS1 on January 10 that a drug deal was about to go down and his or her knowledge of the location where the transaction would occur. CS1 notified Detective Johnson less than 48 hours after his or her initial statement that a drug deal was imminent. CS1 relayed the location and the time where the transaction was supposed to take place—a McDonald's on the east end of Charleston in approximately 15 minutes.

Detective Petty observed a white truck with Ohio license plates enter the parking lot of the McDonald's that CS1 had identified. Furthermore, Detective Petty observed two individuals matching the description provided by the confidential sources in the front seat of the white truck. Although the truck parked, no one got out of the truck which, according to Detectives Johnson and Petty, was consistent with the probability that illegal activity might be about to occur. Detective Petty saw CS1 approach the truck which, in and of itself, served to corroborate the information CS1 provided. Finally, Detective Petty observed what he thought was a hand-to-hand drug deal before he gave the order to approach the truck. Clearly, the totality of the circumstances at that point and time was sufficient to support a brief investigative stop.

Defendant makes much of the fact Detective Petty thought a drug deal had occurred between CS1 and defendant prior to the seizure. However, Detective Petty's mistaken belief that a drug deal had transpired does not necessarily convert an otherwise reasonable seizure into an unreasonable one. See Heien v. North Carolina, 135 S. Ct. 530, 536 (2014) ("As the text indicates and we have repeatedly affirmed, the ultimate touchstone of the Fourth Amendment is reasonableness. . . . To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair

leeway for enforcing the law in the community's protection. . . .
We have recognized that searches and seizures based on mistakes
of fact can be reasonable.") (internal citations and quotations
omitted).  "The limit is that `the mistakes must be those of
reasonable men.'"  Id. (quoting Brinegar v. United States, 338
U.S. 160, 176 (1949)); see also United States v. Avagyan, 164 F.
Supp.3d 864, 884 (E.D. Va. 2016) ("[A]n officer's mistaken
beliefs are typically irrelevant during a motion to suppress, so
long as the mistaken belief is reasonable.").

Based upon the information known to Detective Petty about
Diablo and B, his knowledge regarding the logistics of drug
deals, and what he observed happening in the McDonald's parking
lot, it was not unreasonable for him to conclude that a drug deal
had occurred.  As the Court explained:

> The Fourth Amendment prohibits "unreasonable
> searches and seizures."  Under this standard, a search
> or seizure may be permissible even though the
> justification for the action includes a reasonable
> factual mistake.  An officer might, for example, stop a
> motorist for traveling alone in a high-occupancy
> vehicle lane, only to discover upon approaching the car
> that two children are slumped over asleep in the back
> seat.  The driver has not violated the law, but neither
> has the officer violated the Fourth Amendment.

Id. at 534.


C.    *Detective Petty Observes a Firearm and Defendant is*
      *Handcuffed.*

The fact that defendant was handcuffed did not convert his detention into a de facto arrest. The Fourth Circuit has "recognized that `drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest.'" United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007) (quoting United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995)). In this case, the officers testified that all occupants of the truck were handcuffed for officer safety. Law enforcement had received information from two sources that defendant carried a gun and was an enforcer. Furthermore, Detective Petty had observed a firearm under defendant's leg. Therefore, as in Elston, "[t]hese officers reasonably suspected that [defendant] was armed and dangerous, and thus did not exceed the limits of a Terry stop by drawing their weapons and placing [defendant] in handcuffs." Id.

D.  *Detective Aldridge Searches Defendant's Person*

If a law enforcement officer has a reasonable suspicion that a suspect may be armed and dangerous, the officer is permitted to conduct a frisk and limited search for weapons. See United States v. Powell, 666 F.3d 180, 185 (4th Cir. 2011). Regarding reasonable suspicion, the Fourth Circuit has counseled:

> The standards governing our determination of reasonable suspicion are well-defined. In the context of this case, reasonable suspicion is a particularized and objective basis for suspecting that the person to be

frisked is armed and dangerous. <u>Ornelas v. United States</u>, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed.2d 911 (1996). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." <u>Terry</u>, 392 U.S. at 27, 88 S. Ct. 1868. "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed.2d 570 (2000), and it is measured by the totality of the circumstances, <u>United States v. Arvizu</u>, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed.2d 740 (2002).

"The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion." <u>Digiovanni</u>, 650 F.3d at 511. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." <u>Florida v. J.L.</u>, 529 U.S. 266, 271, 120 S. Ct. 1375, 146 L. Ed.2d 254 (2000).

<u>Id.</u> at 185-86 (footnotes omitted); <u>see also</u> <u>United States v. George</u>, 732 F.3d 296, 299 (4th Cir. 2013) ("The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered.") (citation omitted).

In this case, a reasonably prudent officer would be warranted in his belief that defendant was armed and dangerous, justifying a patdown search. Both CS1 and CS2 noted that defendant was known to carry a firearm and was an "enforcer". Indeed, law enforcement had just observed a firearm under his leg. Under these circumstances, a reasonably prudent person would be justified in searching defendant's person for additional weapons. <u>See, e.g.</u>, <u>United States v. Yamba</u>, 506 F.3d 251, 255-56

(3d Cir. 2007) (finding an officer's observation that a suspect held an open pocket knife to be a relevant factor justifying a search for additional weapons); <u>United States v. Vinton</u>, 594 F.3d 14, 20 (D.C. Cir. 2010) (holding that an officer who removed a knife from a suspect's immediate vicinity and placed it out of arm's reach was "justifiably concerned that additional weapons might be hidden elsewhere in the vicinity."); <u>United States v. Christian</u>, 187 F.3d 663, 669 (D.C. Cir. 1999) ("The presence of one weapon may justifiably arouse concern that there may be more in the vicinity."); <u>United States v. Thomas</u>, 142 F. App'x 896, 2005 WL 1869676 (6th Cir. Aug. 3, 2005) ("Thomas claims that the officers had no reason to believe he might be armed, because they observed him throwing an object that <u>appeared</u> to be a gun.  Of course, the fact that Thomas threw one gun did not rule out the possibility that he had additional weapons on his person.") (emphasis in original).

E.   *Defendant is Placed Under Arrest*

"In general, a warrantless arrest is proper for purposes of the Fourth Amendment where the facts and circumstances within the arresting officer's knowledge are sufficient for a reasonable person to believe that a crime has been or is being committed by the person to be arrested."  <u>United States v. Miller</u>, 925 F.2d 695, 698 (4th Cir. 1991).  Defendant was arrested only after law enforcement recovered suspected methamphetamine and heroin from

his person, as well as a large amount of U.S. currency. Additionally, defendant was discovered sitting on a firearm. The court has little trouble concluding that probable cause supported defendant's arrest for possession with intent to deliver a controlled substance.

F.    *Search of the Vehicle*

After defendant was placed under arrest, Detective Petty and other law enforcement personnel searched the truck. From the truck's center console, which was within reach of all four occupants of the vehicle, large quantities of methamphetamine and heroin were recovered, along with scales. This seizure was not unreasonable under the Fourth Amendment for two different reasons: 1) the exception for warrantless searches of vehicles incident to arrest; and 2) the automobile exception.

"Warrantless searches `are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions.'" United States v. Baker, 719 F.3d 313, 316 (4th Cir. 2013) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted)). Of the search incident to arrest exception, our appeals court has stated:

> [T]he exception for searches incident to an arrest authorizes vehicle searches only in two specific circumstances. The first circumstance is when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search. . . . The second is when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle. . . . When these justifications are

19

> absent, . . . a search of an arrestee's vehicle will be
> unreasonable unless police obtain a warrant or show
> that another exception to the warrant requirement
> applies.

Id. at 317 (internal citations and quotations omitted).  As for

the automobile exception, it "permits a warrantless search of a

vehicle when there is probable cause to believe the vehicle

contains contraband or other evidence of criminal activity."  Id.

(citing Carroll v. United States, 267 U.S. 132 (1925)).  One

court observed that "searches predicated on the `search incident

to arrest' theory and those predicated on the `automobile

exception' are interrelated, but not identical."  United States

v. Paige, 870 F.3d 693, 702 (7th Cir. 2017) (internal citation

and quotation omitted).

　　　With respect to the "search incident to arrest" exception,

the first prong is inapplicable because defendant was not

unsecured at the time of the search.  However, the second prong

clearly applies because law enforcement had a reasonable basis to

believe that evidence relevant to defendant's offense of arrest,

possession with intent to deliver a controlled substance, would

be found in the truck.  Law enforcement had already recovered

narcotics from defendant's person and both CS1 and CS2 stated

that Diablo and B trafficked in large quantities of

methamphetamine and heroin.

　　　The automobile exception is also applicable because the

officers had probable cause to believe that additional evidence

of criminal activity would be found in the vehicle.  As noted above, the officers had already found drugs, as well as a firearm.  Coupled with the information provided by the confidential sources, there was ample probable cause to search the vehicle.  See, e.g., Baker, 719 F.3d at 319 (holding that, "having found drugs, as well as other items indicating involvement in the drug trade, on Brown's person, [law enforcement] had probable cause to search the passenger compartment of the vehicle in which Brown had just been sitting for additional contraband"); United States v. Brown, No. 16-4410, 677 F. App'x 827, 829 (4th Cir. Jan. 31, 2017) (finding probable cause to search moped based on small amount of marijuana recovered from defendant's person as well as defendant's nervous behavior and location in a high crime area).

### III.  Conclusion

Based on the foregoing, the defendant's motion to suppress is **DENIED**.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record, to the United States Marshal for the Southern District of West Virginia, and to the Probation Office of this court.

IT IS SO ORDERED this 28th day of May, 2019.

ENTER:    _David A. Faber_

David A. Faber
Senior United States District Judge